UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:17-cr-133-CLC-SKL |
| | ) |
| DERRICK MCKINNEY, | ) |
| | ) |
| Defendant. | ) |

**REPORT & RECOMMENDATION**

Before the Court is a motion to suppress filed by Defendant Derrick McKinney ("Defendant") with a supporting memorandum [Docs. 41, 42]. Plaintiff United States of America ("the Government") filed a response in opposition to the motion [Doc. 46]. The motion to suppress was referred for a report and recommendation by standing order and an evidentiary hearing on the motion was held on June 13, 2018. The parties filed post-hearing briefs [Docs. 49, 50], and the motion is now ripe. After fully considering the evidence and argument, I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

I.   **FACTUAL BACKGROUND**

The Government called the sole witness at the hearing, Chattanooga Police Department ("CPD") Officer Celtain Batterson ("Batterson"). The traffic stop, vehicle search, and pertinent questioning by Batterson and responses to the questioning by Defendant—both on the scene of the traffic and at the jail—were all recorded.[1] The pertinent facts from the testimony and recordings

---

[1] The recordings were made Exhibits 1 and 3. The body camera recording from the traffic stop has a date and time stamp labelled "2017-09-01 T01:03." The in-patrol car camera time stamp reads 08/31/2017 21:02 hours, which is a time consistent with Batterson's report and testimony.

are summarized below

On the night of August 31, 2017, Batterson made a traffic stop of a car driven by Defendant for a Tennessee tag light violation. There were four passengers in the car. At his initial contact with the vehicle occupants, Batterson recognized Defendant and some of the occupants as gang members. Batterson had previously arrested Defendant and knew Defendant did not have a driver's license. Batterson also smelled an odor he recognized to be marijuana coming from the vehicle upon his initial contact with Defendant. At that initial contact, Batterson asked for Defendant's driver's license. In response, Defendant admitted he was driving without a driver's license, which Batterson knew was an arrestable offense under Tennessee law. Batterson obtained identification from the car occupants and went to his patrol car to "run" the information.

Although Batterson had not yet requested backup, other officers began to arrive as backup almost immediately given the location of the stop. Before any of the statements at issue were made, five backup officers—including, by happenstance, a canine unit—arrived at the scene. Batterson did not request the canine unit.

During the traffic stop, Batterson thought the Defendant and the other known passengers were convicted felons who could not legally possess a gun. Between the questioning at the traffic stop and the later questioning at the Sheriff's Department booking room, Batterson learned that Defendant did not have any felony convictions. Prior to questioning Defendant at the traffic stop, Batterson learned from his dispatcher that Defendant was the subject of a Georgia arrest warrant.

---

Although the time stamps of the recordings are not consistent, the recordings depict the incident at issue. The traffic stop body camera footage begins at the start of the traffic stop and ends when Batterson arrived at the jail. A DVD-R labeled "17-085783 Batterson BWC #2 (Jail) Winbush 09/01/17" contains a recording from Batterson's body camera from inside the jail as Batterson questions Defendant later that night. The time stamp on the jail recording displays "2017-09-01 T04:19:35," and it was approximately 27 minutes long.

2

Although Batterson had smelled marijuana himself and believed a gun would be in the car based on his prior encounters with Defendant and the other known passengers, he decided to have the canine unit deployed before searching the car or arresting Defendant for driving without a license and/or on the outstanding Georgia arrest warrant. To deploy the canine unit, the car must be empty for safety reasons. Batterson and the other officers began the process of removing the occupants of the car.

For officer safety reasons, because some of the occupants were thought to be prominent gang members who would be armed, Batterson wanted to remove each occupant one at a time. Batterson believed Defendant was a gang member who had been arrested on prior assault, cocaine, and weapons charges, and also had multiple arrests for driving offenses. Batterson called Defendant out of the car first. Batterson had Defendant lean against his patrol car as Batterson patted down or frisked the outside of Defendant's clothes while asking if Defendant had any dangerous weapons on him. He then asked Defendant when was the last time someone had weed in his car. Batterson said he asked this question so Defendant could explain the smell. Batterson equated the question to asking a driver suspected of driving under the influence if he had been drinking. Defendant responded that he had smoked marijuana earlier. Batterson then asked how long ago, and Defendant admitted "about an hour ago." Batterson told Defendant to put his hands behind his back as Defendant was being detained, but was not being arrested at the time. Defendant asked why he was being detained and Batterson told him because he (Defendant) had possible warrants out of Georgia, was driving on a revoked license, and had been smoking weed. Batterson placed handcuffs on Defendant and Defendant sat on the hood of the patrol car.

Batterson told Defendant he was going to run the canine unit. After a little bickering by Defendant about whether that was necessary given his admission to smoking weed, Batterson

3

noted that he was not asking Defendant for consent and did not need it since he (Batterson) smelled marijuana. The other officers began to empty the car one-by-one. They frisked the other passengers, but did not place them in cuffs. Batterson said he placed his only pair of cuffs on Defendant because he was the first occupant removed from the car—not because he was under arrest—and that he does not know why the other occupants were not cuffed by the other officers.

The canine unit was deployed, but the dog's sniff of the car is not visible in the recording. The parties disagree about whether the drug detection dog alerted to the odor of narcotics from the vehicle. Batterson said the dog-handling officer signaled to him that the dog alerted to the odor of drugs in the car. A copy of the report of the alert was made Exhibit 2 by the Government. After the dog sniff, on the recording the dog handler inaudibly says something to Batterson who then said, "nothing in the car" and Defendant said, "I told you there was nothing in the car." Batterson testified he was not talking to the handler and indicated he was instead looking at Defendant and sarcastically repeating "nothing in the car?" because the dog alerted as he knew it would since he had smelled marijuana.

Batterson and another officer began to search the car. At first, the officers found nothing. Talking to the other officer, Batterson indicated several times that he wanted to find the gun he believed was present. Batterson was heard saying, "These guys know what they're doing. I don't know what happened." Batterson directed the other officer to check behind the speaker for evidence. During cross-examination, Defendant questioned Batterson about whether this comment referred to the dog's failure to alert on the car. Batterson testified that he was talking to the other officer about how the car door became locked when he said he did not know what happened. Batterson emphatically testified the canine handler reported the dog did alert to the presence of narcotics in the car.

4

On the tape, Batterson said to the other officer searching the car with him that the occupants knew what they were doing and had time to hide contraband. Within a few minutes of starting the search, a pistol and cash was located under the center console. As soon as the gun was located, Batterson directed that all occupants of the car be placed in cuffs. A small bag of marijuana was located in the car a little later. Batterson can be heard on the recording requesting the canine handler to send him the completed form about the dog's "hit" on the car, which eventually became Exhibit 2 at the hearing.

After finding the firearm, Batterson arrested Defendant, who was still in handcuffs, and advised Defendant of his *Miranda* rights. Defendant waived his *Miranda* rights.[2] After the waiver, Batterson questioned Defendant about ownership and possession of the gun, what it looked like, and where it was found in the car. Although Defendant indicated he did not know where the gun was found, he claimed the firearm and said it was black and brown. Defendant loudly announced to the other nearby occupants of the car that he had claimed ownership of the gun and indicated that they should get a lawyer if they were locked up for it.[3] Batterson told Defendant, "me and you are going to talk again" and stopped questioning Defendant who was then placed in the back of the patrol car.

Defendant was taken to jail for booking after remaining in the patrol car with one of the female occupants of the car at the traffic stop scene for a time. He was charged under state law with a tag light law violation, a driving on a revoked license violation, and with unlawful

---

[2] Defendant has not challenged the sufficiency of the content of the *Miranda* warning or claimed his waiver was unknowing or involuntary.

[3] Defendant says, "That mine. It's mine. You said you find it in my car. It's mine. All y'all heard it. It's mine. So if you wanna lock all y'all up [unintelligible few words], y'all need y'all a good, little lawyer." [Ex. 1; T01:48:45-T01:48:58].

5

possession of a weapon. The parties agree that two hours passed without any further interrogation at the scene of the traffic stop or while waiting for an interview/booking room to open up at the Sheriff's Department adjacent to the jail, although there was some small talk between Defendant and Batterson. The parties also agree 3 hours and 36 minutes passed between when Defendant received his *Miranda* advisement and waived his rights at the traffic stop and when his custodial interrogation without re-advisement of his *Miranda* rights took place. Once the interview room was made available, Batterson questioned Defendant using a CPD "Firearms Related Arrests Form."

Batterson explained to Defendant that he has a form to complete in reference to guns or drugs being seized. Batterson asked Defendant if he was still active with Bounty Hunter (i.e., the Bounty Hunter Bloods gang), and Defendant stated he was not active. Batterson went through the CPD Firearms Related Arrests Form. Defendant denied knowing the make, model, or caliber of the firearm, denied knowing if the firearm was loaded, and denied knowing how many rounds were in the firearm. At approximately 17 minutes into the recording, Defendant stated he had a bill of sale for the firearm, but refused to identify the seller. Defendant asked whether if he brought the bill of sale with him to court, he could "get my gun back." Defendant also stated that the firearm was "special" to him because of the unidentified seller. Around 18 minutes inot the recording, Defendant admitted (again) that he smoked marijuana "today" (i.e., the day of his arrest). About 20 minutes into the recording, Defendant stated he got the gun about two years ago, but when Batterson tried to narrow the timeframe, Defendant said he got the firearm around June 2017. At approximately 24 minutes and 40 seconds into the recording, Defendant says he smoked marijuana every day since he was approximately 10 or 11 years old. Defendant also asked if the form is new, indicating it was not used the last time Batterson arrested Defendant. Batterson

6

completed the form with Defendant's responses, and Defendant signed it. Defendant agrees on the form, which was made Exhibit 4 at the hearing, that he was been arrested for narcotics, weapons, and driving violations and that he has convictions for assault and driving charges.

At the hearing, Defendant proffered information from the Court-ordered mental evaluation of Defendant pursuant to 18 U.S.C. §§ 4241 and 4247 [Doc. 31].[4] In the forensic evaluation report [Doc. 40], the evaluators noted Defendant claimed a tenth grade education. The report also states Defendant was not fully engaged during testing and, as a result, the evaluators opined the test results may underestimate his true cognitive functions, but the test results indicate an IQ of 67, which falls in the extremely low intellectual range. Defendant was 26 when arrested on August 31, 2017 and 27 when evaluated.

## II. ANALYSIS

### A. Standards

The Fourth Amendment prohibits *unreasonable* searches and seizures. U.S. Const. amend. IV.[5] In other words, seizures are not prohibited by the Constitution; rather, the Constitution requires a seizure be reasonable under the circumstances. *See Elkins v. United States*, 364 U.S.

---

[4] On May 1, 2018, Defendant filed a notice of waiver of competency hearing [Doc. 37]. Based on the record and Defendant's waiver, the Court determined that Defendant is not currently suffering from a severe mental disease or defect, which renders him mentally incompetent to the extent he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense and Defendant is competent [Doc. 39].

[5] To be constitutional, a traffic stop for a tag light violation must be supported by a "reasonable suspicion." *See United States v. Simpson*, 520 F.3d 531, 540 (2008). A defendant has the burden of establishing a legitimate expectation of privacy to assert a Fourth Amendment right. *United States v. Ocampo*, 402 F. App'x 90, 96 (6th Cir. 2010) (quoting *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)); *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008) (quoting *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001)). As preliminary matters, the Government does not dispute that Defendant had a legitimate expectation of privacy with respect to the stop and Defendant does not challenge the traffic stop itself.

206, 222 (1960) ("[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures."). Stopping a vehicle and detaining its occupants is a seizure—a non-consensual, investigative detention—under the Fourth Amendment. *United States v. Cortez*, 449 U.S. 411, 417 (1981); *United States v. Gross*, 550 F.3d 578, 582 (6th Cir. 2008). The underpinning for analysis of the constitutionality of a traffic stop is provided in *Terry v. Ohio*, 392 U.S. 1, 16 (1968) and its progeny. *Whren v. United States*, 517 U.S. 806, 809-10 (1996).[6]

The Fifth Amendment protects a person from being compelled to incriminate him or herself. *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). A suspect who is in custody and subject to interrogation must be given *Miranda* warnings against self-incrimination. *Id.* at 467-68. Law enforcement officers are required to adequately and effectively apprise such suspects of their rights and must fully honor the suspect's decision should she or he seek counsel before answering questions. *Id.* at 467. If the suspect is given proper *Miranda* warnings and agrees to answer questions without counsel, the officer can then question the suspect freely. *Davis v. United States*, 512 U.S. 452, 458 (1994) (citing *North Carolina v. Butler*, 441 U.S. 369, 372-76 (1979). However, *Miranda* requires courts to exclude unwarned custodial statements, "even if wholly voluntary." *Withrow v. Williams*, 507 U.S. 680, 706 (1993).

In his motion to suppress evidence, Defendant raises issues regarding his statements and the search of his car. I will address each of Defendant's statements first, and then turn to the search of his car.

---

[6] The Sixth Circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citations omitted); *see also Simpson*, 520 F.3d at 541 (holding that reasonable suspicion standard is sufficient for ongoing traffic violation, but not a completed misdemeanor).

8

### B. Statements

Defendant seeks to suppress three statements: (1) his admission to having smoked marijuana prior to the traffic stop, which statement was made prior to the administration of his *Miranda* warnings; (2) his admission to having owned the firearm discovered in his car, which admission was made at the scene of the traffic stop after the *Miranda* warning and waiver; and (3) his confession, which was made after he had been transported to the jail without re-advisement and waiver of *Miranda* rights.

#### 1. Pre-*Miranda* Statement at the Traffic Stop

During the traffic stop before any questioning, Batterson smelled marijuana coming from the car, knew Defendant was driving on a revoked license, and found out Defendant was the subject of an active arrest warrant. As a result, he planned to arrest Defendant and planned to search the car. Even though Batterson believed he had sufficient probable cause to search the car without a dog sniff, he also planned to deploy a canine unit before searching the car since one was on the scene.

To effect this plan, Batterson got Defendant out of the vehicle, patted him down, and—without first giving a *Miranda* warning—asked Defendant whether he had weapons on him and when someone had "weed" in the car. Defendant's original motion appears to contend this initial questioning occurred after he had been placed in handcuffs, but the recording does not bear this out. Defendant also takes issue with the delay between when Batterson determined he had grounds to arrest Defendant and when he formally told Defendant he was under arrest. This is a factor to consider under the totality of the circumstances, and it has been taken into consideration. While Batterson had probable cause to make a custodial arrest of Defendant based on Defendant's driving without a license and the outstanding arrest warrant, he had not yet done so because he

9

was continuing his investigation.

In response to the pre-*Miranda* question, Defendant admitted that he smoked "a little while ago." Defendant contends that this admission of smoking marijuana, which occurred before Defendant was handcuffed, but while he was being patted down in the presence of some five police officers, should be suppressed because it was the product of custodial interrogation without an advisement or waiver of *Miranda* rights. Defendant notes that "Officer Batterson candidly admitted that Mr. McKinney was not free to leave at the time he made the statement about his use of marijuana" and argues this rendered Defendant in custody for *Miranda* purposes; and, thus, subject to its protections. [Doc. 49 at Page ID # 117-19]. The Government contends Defendant, though detained, was not in custody such that *Miranda* warnings were required when he made the admission to smoking marijuana, and, therefore, the statement should not be suppressed. I agree with the Government.

*Miranda*'s procedural safeguards apply to suspects only if they are subjected to a custodial interrogation, but regardless of whether formal criminal proceedings have begun. *United States v. Ray*, 803 F.3d 244, 266 n.12 (6th Cir. 2015). "A suspect is in 'custody' for *Miranda* purposes if there has been a 'formal arrest or restraint on freedom of movement.'" *Id.* (quoting *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003) (quoting another source). *See also United States v. Malcolm*, 435 F. App'x 417, 420 (6th Cir. 2011) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)) (holding *Miranda*, "only applies where there has been such a restriction on a person's freedom as to render him in custody."). The pertinent issue is whether Defendant was otherwise "in custody" for purposes of *Miranda* when questioned about the last time "weed" was smoked in his vehicle.

> Whether a suspect is "in custody" is an objective determination that
> requires two discrete inquiries: "first, what were the circumstances

10

> surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted). Both police and courts must "examine all of the circumstances surrounding the interrogation," including those that may affect how a reasonable person in the suspect's position would perceive his freedom to leave. *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994). But the test does not involve consideration of the particular suspect's "actual mindset." *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004).

*Ray*, 803 F.3d at 266 n.12.

There are degrees of detention. *See generally United States v. Jones*, 673 F.3d 497, 503 (6th Cir. 2012) (citing *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010)) (listing three levels of detention). "In a *Terry* stop, officers may briefly detain a person for investigative purposes so long as it is 'reasonable.'" *United States v. Young*, 707 F.3d 598, 603 (6th Cir. 2012) (citing *Terry*, 392 U.S. at 20-22). When a person is not under arrest but is nonetheless subject to a detention pursuant to *Terry*, he is not entitled to *Miranda* warnings even though police engage in limited questioning. *Berkemer v. McCarty*, 468 U.S. 420, 439-41 (1984); *see United States v. Swanson*, 341 F.3d 524, 528-29 (6th Cir. 2003) ("The very nature of a *Terry* stop means that a detainee is not free to leave during the investigation, yet is not entitled to *Miranda* rights."); *United States v. Thomas*, 142 F. App'x 896, 900 (6th Cir. 2005). The Sixth Circuit employs a totality-of-the-circumstances approach using a reasonable-man-in-the-suspect's-position standard when deciding whether a person is in custody. *Ray*, 803 F.3d at 266 n.12; *Malcolm*, 435 F. App'x at 420; *see also, United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (listing the factors as "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions."); *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (listing the factors as "the location of the interview; the length and manner of

11

questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions.").

Applying these factors to consider whether the *Terry* stop had become an arrest at the time of Defendant's first admission, I **FIND** it did not. The place of the questioning was the side of the road, and, while there were five officers present, there was no coercion. No weapons were drawn. Batterson was cordial, and the length of the questioning was less than one minute. Defendant was not in handcuffs or the back of the police patrol car during the questioning. *See United States v. Wright*, 220 F. App'x 417, 420-421 (6th Cir. 2007) (holding even when a defendant is in the back of a patrol car, *Miranda* warnings are not necessary during a *Terry* stop/investigation). I **FIND** Batterson's initial questioning during the pat-down did not require a *Miranda* warning and waiver. Defendant's response to this questioning, *i.e.*, that he smoked marijuana "a little while ago," should not be suppressed as a result.

### 2. Post-*Miranda* Statement at the Traffic Stop

Defendant takes issue with his post-*Miranda* confession at the traffic stop claiming it is "fruit of the poisonous tree," because his first admission allegedly was the result of a *Miranda* violation. Defendant's "fruit of the tree" argument fails, however, because the initial question during the pat-down was not a "poisonous" custodial interrogation requiring a *Miranda* warning and waiver, as noted above.

Because Defendant's *Miranda* waiver at the traffic stop is at issue with respect to a later confession, the validity of the waiver—although not challenged by Defendant –will be briefly addressed. "A waiver of *Miranda* rights must be voluntary that is, 'the product of a free and deliberate choice rather than intimidation, coercion or deception.'" *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (citations omitted) (internal quotation marks omitted). Such a

waiver must also be "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Daoud v. Davis*, 618 F.3d 525, 529 (6th Cir. 2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The government bears the burden of establishing a waiver of *Miranda* rights by the preponderance of the evidence. *Adams*, 583 F.3d at 467 (6th Cir. 2009) (citing *United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008)).

When a defendant alleges coercion, the government bears the burden of proving, by a preponderance of the evidence, that the confession was given voluntarily, knowingly, and intelligently. *United States v. Ostrander*, 411 F.3d 684, 696 (6th Cir. 2005). There are three requirements to finding statements to be involuntary: (1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear defendant's will; and (3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *United States v. Luck*, 852 F.3d 615, 622 (6th Cir. 2017) (quoting *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016)) (quoting another source). When determining whether a confession was elicited by unconstitutional means, the court looks at the totality of the circumstances concerning whether a defendant's will was overborne in a particular case. *United States v. Crumpton*, 824 F.3d 593, 606 (6th Cir. 2016) (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). Importantly, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *accord United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989) (finding evidence of an impaired "cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary."). Factors to consider under the totality-of-the-circumstances standard include the age, education, and prior criminal experience of the accused; the length, intensity, and frequency

13

of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. *See Arizona v. Fulminante*, 499 U.S. 279, 286 n.2 (1991) (listing potential factors); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (listing potential factors).

I **FIND** Batterson properly advised Defendant of his *Miranda* rights and Defendant indicated he understood his rights and was willing to answer questions. Examining the facts and circumstances surrounding the post-*Miranda* questioning, neither coercive, intimidating, nor deceptive tactics were employed by the police. Defendant, considered by police to be a prominent gang member, had prior experience with law enforcement from arrests and convictions. While he was handcuffed during the interrogation, the officers had their weapons holstered. Defendant responded to questions and provided information in a coherent manner.

Although several officers—a total of five—were present, and a canine, Defendant has not proven any police coercion, which is necessary for the Court to find his post-*Miranda* confession was involuntary. *See Connelly*, 479 U.S. at 164 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."); *Newman*, 889 F.2d at 94 ("Evidence that a defendant suffered . . . from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary."). I **FIND** Defendant made a voluntary, knowing and intelligent waiver of his *Miranda* rights and his confession at the traffic stop scene should not be suppressed.

### 3. Statements at the Booking Room

It is undisputed that Batterson handcuffed Defendant approximately twelve minutes after initiating the traffic stop. When the gun was found about 30 minutes later, Defendant was

14

Case 1:17-cr-00133-CLC-SKL   Document 52   Filed 07/05/18   Page 14 of 20 PageID #: 217

informed he was under arrest and given *Miranda* warnings. Defendant waived the right to counsel and to remain silent and made incriminating statements about the gun at the traffic stop as noted above. Approximately 10 minutes later, Batterson placed Defendant in the back of his patrol car where he waited for approximately 32 minutes before Batterson drove to the Sheriff's office adjacent to the jail.

At the Sheriff's office, while waiting for a booking room to open up, Batterson and Defendant remained together. Batterson told Defendant that he (Batterson) had to complete a CPD form anytime that he made an arrest involving "guns or dope." Once a booking room became available, Defendant, who was no longer in handcuffs, was taken into the booking room by Batterson.

In the booking room, Batterson asked Defendant questions listed on the form without first again advising Defendant of his *Miranda* rights. The time lapse from the *Miranda* advisement/waiver and confession at the traffic stop to the booking room custodial interrogation is a little more than three hours. As noted above, Defendant does not dispute that when Batterson provided the *Miranda* warning at the traffic stop, it was a proper advisement or that Defendant knowingly and voluntarily waived his rights. Rather, Defendant argues that Batterson's questioning of him at the booking room required a second *Miranda* advisement and waiver.

"'The courts have generally rejected a *per se* rule as to when a suspect must be readvised of his rights after the passage of time or a change in questioners.' In fact, a number of circuits have ruled that re-warning is not required simply because time has elapsed." *See United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997) (citation omitted) (quoting *United States v. Andaverde*, 64 F.3d 1305, 1312 (9th Cir. 1995)) (determining a one-hour break to be acceptable and cataloguing cases showing readministration of *Miranda* not required *per se*). As acknowledged

15

by both parties, there is no bright-line rule about when officers must readvise defendants of their *Miranda* rights. *Weekley*, 130 F.3d at 751 (noting that a number of circuits have ruled that re-warning is not required simply because time has elapsed" and finding that a one-hour delay between the advisement of *Miranda* rights and an interview was acceptable); *United States v. White*, 68 F. App'x. 535, 538 (6th Cir. 2003) (finding a three-day break permissible where the defendant had requested time to think and was reminded of his rights); *United States v. Harris*, 983 F.2d 1069, at *5 (6th Cir.1992) (table) (per curiam) (identifying a burden on defendants to indicate a desire to remain silent and finding *Miranda* rights still in effect after "several hours"); *Treesh v. Bagley*, 612 F.3d 424, 432 (6th Cir. 2010) (citations omitted) ("[A]dditional warnings are only required if the circumstances seriously changed between the initial warnings and the interrogation."); *Mitchell v. Gibson*, 262 F.3d 1036, 1057-58 (10th Cir. 2001) ("Courts have consistently upheld the integrity of *Miranda* warnings even in cases where 'several hours' have elapsed between the reading of the warning and the interrogation.")

Courts consider the totality of the circumstances to determine whether police must readvise a criminal defendant of his rights under *Miranda* prior to initiating additional questioning. As held in *White*, factors to include in this determination include:

> (1) time elapsing between arrest and arraignment of the defendant; (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession; (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him; (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

*Id.* at 538 (citing *Weekley*, 130 F.3d at 750). Applying such factors, I **FIND,** on balance, they weigh against requiring readvisement of *Miranda* rights in this case.

16

Factors weighing in favor of Defendant's argument for readvisement, there were no subsequent reminders or rewarnings after the initial *Miranda* advisement and waiver. Moreover, the interrogation occurred in a different location than the warning after a time lapse involving no interrogation. Also in Defendant's favor, the importance of the questioning was somewhat minimized as being the mere completion of a CPD-required form. Also, Defendant has extremely low intellectual functioning.

However, factors more strongly weighing against Defendant's argument include that Defendant understood and voluntarily waived his rights at the traffic stop scene in spite of his intellectual challenges. In addition, nothing significant happened in the interval between the time of the *Miranda* warnings/waiver and the interrogation at the booking room to cause Defendant to be unable to fully comprehend the effect of an exercise or waiver of his *Miranda* rights before speaking with police. Moreover, the same officer—Batterson—provided continuity by giving the *Miranda* advisement and interviewing Defendant even though the interrogation location changed. Additionally, the amount of time that elapsed without any interrogation between the warning/waiver/incriminating statements at the traffic stop and the booking room interrogation/incriminating statements was not excessive or strategic given the unavailability of the interview room. In addition, the topics covered during the interrogation at the traffic scene and at the booking room remained fairly consistent and Batterson informed Defendant at the traffic stop scene that they would be talking again.

I will briefly address Defendant's intellectual challenges in more detail. Although Defendant has a low intellect and a limited education, he previously had been arrested on weapons and narcotics charges, he thought to announce to his fellow car occupants that he was claiming the gun and to get a lawyer if they were arrested for it, he has some experience with the criminal justice

17

system such as convictions for assault and several driving charges and other arrests, and he exercised his right to refuse to answer some questions such as from whom he got the gun. Defendant even asked Batterson if the gun form was new. All of this indicates that in spite of his low intellectual functioning measurements, Defendant was aware that he did not have to answer Batterson's questions and he could request a lawyer.

Based on all of the evidence, after weighing all of the factors, and considering the totality of the circumstances and the parties' excellent arguments and the precedent cited therein, I **CONCLUDE** that Defendant knew and understood his *Miranda* rights and that nothing happened between the warning/waiver at the traffic stop scene and Defendant's booking room confession that rendered Defendant unable to fully consider the effect of an exercise or waiver of his rights. Accordingly, I **FIND** Defendant's confession in the booking room should not be suppressed.

### C. Warrantless Car Search

A warrantless search and seizure of a vehicle is permitted when law enforcement officers have probable cause to believe the vehicle contains contraband. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *Maryland v. Dyson,* 527 U.S. 465, 466-67 (1999). The officers may conduct a warrantless search of the vehicle and any containers found therein if there is probable cause to believe that contraband is secreted at some unknown location in the vehicle. *California v. Acevedo*, 500 U.S. 565, 594 (1991) (citations omitted); *United States v. Ross*, 456 U.S. 798, 824 (1982). The validity of such a search turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Batterson testified that he smelled marijuana coming from the vehicle. The Sixth Circuit, like many courts, has held that an officer's detection of the odor of marijuana in an automobile can, by itself, establish probable cause for a search. *United States v. Garza,* 10 F.3d 1241, 1246

18

(6th Cir. 1993); *United States v. Elkins*, 300 F.3d 638, 659-60 (6th Cir. 2002); *see also United States v. Talley*, 692 F. App'x 219, 222 (6th Cir. 2017) ("Nothing in *Elkins*, however, requires an officer to attest that he has specialized training in detecting marijuana's odor before we may give any weight to his claims of having smelled it."); *United States v. Banks*, 684 F. App'x 531, 536 (6th Cir. 2017) (holding the officer, who testified that "he smelled marijuana emanating from the vehicle" rather than just the occupant, had probable cause to search the vehicle prior to a drug-detection dog sniff, so any issues about the dog's reliability did not impact the outcome of the suppression motion). Accordingly, there was ample probable cause to support the warrantless search of Defendant's vehicle if Batterson's testimony that he detected the odor of marijuana from the vehicle is credible. I **FIND** Batterson's testimony entirely credible.

A court has wide latitude for its credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002); *United States v. Ross*, 300 F. App'x 386, 390 (6th Cir. 2008). "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic." *United States v. Caldwell*, No. 1:13-CR-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015) (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)). In this case, there is little-to-no reason to question Batterson's testimony given that Defendant admitted he had recently smoked marijuana in the car and marijuana was found in it.

Moreover, I **FIND** that a narcotics canine alerted to the presence of an odor of narcotics in the vehicle, which also provides probable cause for the warrantless search. The Government and Defendant disagree about whether the dog alerted to the presence of narcotics [Doc. 50 at Page ID # 134; Doc. 49 at Page ID # 131]. This disagreement is largely irrelevant since Batterson's detection of marijuana alone is enough to constitute probable cause. *See Florida v. Jardines*, 569 U.S. 1, 15, n. 2 (2013) (Kagan, J., concurring) ("If officers can smell drugs coming from a house,

they can use that information; a human sniff is not a search, we all can agree."); *see also United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008) (citations omitted) (stating that the smell of marijuana alone creates probable cause for the search of a vehicle). For a complete record, however, I **FIND** the evidence of the canine's alert is wholly credible and that Defendant's argument about the potential meaning of a snippet of conversation on the recording is unavailing and unsupported.

Accordingly, under the totality of the circumstances, I **FIND** ample probable cause for the warrantless search of Defendant's vehicle for contraband. As a result, evidence located in the search should not be suppressed.

## III. CONCLUSION

It is unnecessary to address the Government's alternative good-faith arguments. For the reasons stated above, I **RECOMMEND**[7] that Defendant's motion to suppress [Doc. 41] be **DENIED**.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[7] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).